IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

**DERRICK WHEAT,**                                  Case Number 1:12 CV 266

     Petitioner,                                   Judge Christopher A. Boyko

      v.                                        REPORT AND RECOMMENDATION

**MARGARET BRADSHAW,** Warden

     Respondent.                                   Magistrate Judge James R. Knepp II

### INTRODUCTION

Petitioner Derrick Wheat, represented by the Ohio Innocence Project, is a prisoner in state custody. Petitioner filed a Petition seeking a writ of habeas corpus under 28 U.S.C. § 2254. (Doc. 2). Respondent Warden Margaret Bradshaw filed a Motion to Dismiss (Doc. 8) with attached exhibits (Doc. 8-1). Petitioner then filed a Response (Doc.11) followed by Petitioner's Motion to Supplement Petitioner's Response to Respondent's Motion to Dismiss (Doc. 12). Next, Petitioner moved the Court to require Respondent to file Petitioner's complete state court record. (Doc. 17). Petitioner then moved the Court to hold his Petition in abeyance pending the exhaustion of certain state claims (Doc. 17) and to dismiss the seventh ground for relief in his habeas Petition (Doc. 18). Respondent filed a Response to Petitioner's abeyance request. (Doc. 19). Finally, Petitioner filed a Motion for Discovery (Doc. 20), which Respondent opposed (Doc. 21).

The district court has jurisdiction over the Petition under § 2254(a). This matter has been referred to the undersigned for a Report and Recommendation pursuant to Local Rule 72.2(b)(2). For the reasons discussed below, the undersigned recommends the Respondent's Motion to Dismiss be granted and the Petition be denied.

## FACTUAL BACKGROUND

For purposes of habeas corpus review of state court decisions, findings of fact made by a state court are presumed correct and can only be contravened if the habeas petitioner shows, by clear and convincing evidence, that the state court's factual findings were erroneous. 28 U.S.C § 2254(e)(1); *Mitzel v. Tate*, 267 F.3d 524, 530 (6th Cir. 2001). This presumption of correctness applies to factual findings made by a state court of appeals based on the state trial record. *Mitzel*, 267 F.3d at 530. The  Cuyahoga County Court of Appeals, Eighth District of Ohio, set forth the following findings of fact:

> The state's evidence established that on Friday, February 10, 1995, Clifton Hudson, Jr. was murdered while walking on Strathmore Avenue in East Cleveland, Ohio. His death was caused by multiple gunshot wounds from one or more firearms, which caused him to bleed to death. The coroner ruled his death a homicide.
>
> Tamika Harris, age fourteen, witnessed the murder. She and her friend Monique were walking home on Strathmore Avenue about 5:45 p.m. when they heard a volley of two or three gunshots. Monique turned and ran, but Ms. Harris saw the shooter come around from the back of a black Blazer-type truck, stand in the street, and shoot Clifton Hudson as he was standing on the sidewalk. She testified that the person whom she saw shoot the victim had a black gun "larger than a .25." She then heard three to five more shots and saw Hudson fall to the ground. After the shots were fired, the truck went south and made a right on Manhattan, almost hitting another car. The shooter, whom she later identified as Eugene Johnson, ran past her. She was able to see him clearly as it was still light outside. She said Johnson ran toward the truck, and it slowed down. Although she did not see Johnson get into the truck, after the truck sped away, she did not see Johnson again. The truck then turned left on Ardenall. She was able to see two "black" people in the front seat of the truck. She then went over to the victim, heard him request, "Help", and saw his eyeballs roll back into his head.
>
> Patrolman Tavano of the East Cleveland Police Department responded to the murder scene and interviewed Reginald Longino, Mike Wilson and Eric Reed, who were there. Although each stated he heard the shots, each man, including Eric Reed, told Ptl. Tavano that he did not see anything. When Ptl. Tavano spoke to Ms. Harris, however, he realized that she had pertinent information regarding the incident, and he directed her to the detectives. Ms. Harris gave a statement to the East Cleveland police that same evening regarding what she had witnessed, including her description

2

of the black 4x4 truck, the shooter being of medium complexion and over 5'7", and the shooter's clothing, which she described as a "red and blue Tommy Hilfiger coat, black skully, and black pants."

Later that evening, Ptl. Tavano observed the suspect truck in the driveway at 1836 Knowles, about one-half mile from the scene of the murder. He then called the detectives, who went to the Knowles address. They subsequently followed the truck to Ardenall, where they arrested the defendant and the co-defendant, Laurese Glover. At the time of his arrest, defendant was wearing his Cleveland Indians jacket. The black 4x4 GMC truck was taken to the police garage. In the presence of their parents, defendant and Laurese Glover each gave a statement to the police. Later during the night, co-defendant Eugene Johnson was arrested and, in the presence of his mother, made his statement to the police. When arrested, Johnson was wearing his blue, green and maroon Nautica down jacket over a black hooded sweatshirt. A pair of gloves was found in his jacket pocket.

Detective Johnstone testified as to the oral statements made by Derrick Wheatt and his co-defendants to the police. In each of these statements, Wheatt and his co-defendants stated that while they were in the black truck on Strathmore at the time of the murder, Glover was driving, defendant Wheatt sat in the front passenger seat, and Johnson sat in the back seat. Each stated that he witnessed the murder of Hudson by a thin, light-skinned black man. Defendant Wheatt and Glover noted the shooter as wearing a blue jacket; Johnson, however, stated the shooter's jacket was brown. The day after the murder, Ms. Harris returned to the East Cleveland Police Station, where she identified the black 4x4 truck as the one she saw during the murder. She identified Johnson's black hooded sweatshirt and his Nautica down jacket as the clothing worn by the shooter whom she had seen. The Nautica jacket was similar in color and description to the one described in her statement the evening before that she misidentified as a "Tommy Hilfiger jacket." When Detective Perry showed her photographs of defendant Wheatt and co-defendants Glover and Johnson, she immediately picked the photograph of Eugene Johnson as the shooter. Detective Perry testified that the police did not direct Ms. Harris's identification of the shooter, of his clothes, or of the black 4x4 truck.

At the request of the East Cleveland police, co-defendant Glover's 4x4 truck was processed for gunshot residue. The Ohio Bureau of Criminal Investigation determined that lead residue consistent with a firearm having been fired was found on the exterior passenger-side door below the window, the interior passenger-side door armrest, and the front passenger seat bottom.

The hands of each of the subjects, including defendant Wheatt, were swabbed by the East Cleveland police during the night of their arrest for atomic absorption testing. The findings from both sides of both hands of defendant Wheatt were positive for antimony and barium, consistent with gunshot residue. The state's expert concluded

3

that such findings indicate that the defendant either fired a weapon or that his hands were "very, very close" to a weapon as it was fired. The hands of each of the two co-defendants were found negative for gunshot residue. Defendant Wheatt's Cleveland Indians jacket was analyzed and found to have nitrite particles on the left sleeve consistent with its being exposed to gunshot residue. The jacket of co-defendant Johnson did not have a positive reaction to the testing; however, the test result on the palm of his left glove was consistent with gunshot residue. The results of the test on the right palm were inconclusive, and results of the test on the backs of the gloves were negative.

At the close of the state's case, the defense moved for acquittal pursuant to *Crim.R. 29*. The court found that sufficient evidence of prior calculation and design did not exist to prove the charge of aggravated murder, but evidence sufficient to support the charge of murder was presented by the state, and, therefore, the motion for acquittal was denied.

The defense presented two witnesses. First, Leroy Malone testified on behalf of co-defendant Johnson. He stated that he heard shots, observed a black Ford Bronco, and saw a light-skinned man running on foot behind the vehicle. The man stopped, put something in his pants, and ran down Shaw Avenue. He did not get into the truck. Malone stated that he knew all three defendants in this case. He saw the three people in the black truck who resembled the defendants. A neighbor told him it was Wheatt, Glover and Johnson, but he did not give the names of these individuals to the police because he "assumed" that the police already knew who they were. He testified that the man he saw running away was not one of the defendants.

Next, Eric Reed, testifying on behalf of defendant Wheatt, said that when he heard the shots, he ran to his upstairs window, from where he saw the shooter standing and the victim on the ground. He described the shooter as a light-skinned black male wearing a dark jacket and hood. He further testified that none of the defendants was the shooter whom he had seen that afternoon.

The defense rested, and counsel renewed the *Crim.R. 29* motions for acquittal, which were denied by the court. Motions for mistrial were made and were denied by the court.

The jury returned guilty verdicts against defendant Wheatt on both the charge of murder and the gun specification. The defendant timely appeals these convictions.

(Doc. 8-1, Ex. 7).

4

## STATE COURT CONVICTION

On June 13, 1995, a Cuyahoga County Grand Jury issued an indictment charging Petitioner and co-defendants Laurese Glover ("Glover") and Eugene Johnson ("Johnson") with one count of Aggravated Murder each, pursuant to Ohio Revised Code § 2903.01, including a firearm specification. (Doc. 8-1, Ex. 1) (Case No. CR95-324431). The charges arose from the shooting of Clifton Hudson. All three defendants entered a plea of not guilty to the indictment and a joint trial commenced on January 8, 1996. At the close of the State's case, all three defendants moved for acquittal pursuant to Ohio Crim.R. 29. The trial court found insufficient evidence to establish prior calculation and design, and amended the indictment to the lesser charge of Murder defined in Revised Code § 2903.02 with respect to each defendant. (Doc. 8-1, Ex. 2; Doc. 8-8). Upon conclusion of their case, defense counsel renewed their Ohio Crim.R. 29 motions, which the court denied. (Doc. 8-8). On January 18, 1996, the jury found Petitioner and Johnson guilty of murder, including the firearm specification. Glover was convicted of murder, without the firearm specification. (Doc. 8, at 5). On January 22, 1996, the court sentenced Petitioner to a term of fifteen years to life imprisonment, plus an additional three years for the firearm specification. (Doc. 8-1, Ex. 3).

## DIRECT APPEAL

Represented by different counsel, Petitioner filed a timely notice of appeal to the Eighth District Court of Appeals, Cuyahoga County. (Doc 8-1, Ex. 4) (Case No. CA96-70197). In his brief, Petitioner asserted the following assignments of error:

1.    The evidence presented by the State of Ohio in its case in chief was insufficient as a matter of law and pursuant to Rule 29 of the Ohio Criminal Rules of Procedure, the trial court erred by not dismissing.

5

2.    The verdict is against the manifest weight of the evidence.

3.    Appellant's due process rights and right to a fair trial were violated by prosecutorial misconduct during opening and closing arguments.

4.    The trial court erred to the prejudice of the Appellant in violation of Appellant's right to due process, when it denied Appellant's motions for mistrial.

5.    Appellant's right to effective assistance of counsel as guaranteed by the Sixth Amendment to the United States Constitution and the Constitution of the State of Ohio when Appellant's trial counsel failed to filed a motion to suppress Tamika Harris' out-of-court and in-court identification.

6.    Appellant hereby joins, adopts and incorporates any and all assignments of error and arguments presented before this Honorable Court by his co-defendants-appellants in their appellate briefs.

*State v. Wheat*, 1997 Ohio App. LEXIS 96 (Ohio Ct. App. 1997).

On January 27, 1997, the Court of Appeals, affirmed the judgment of the trial court. (Doc. 8-1, Ex. 7). Petitioner filed a notice of appeal and a memorandum in support to the Ohio Supreme Court on March 13, 1997. The State filed a memorandum in response. Petitioner's appeal to the Ohio Supreme Court was dismissed on May 28, 1997 because it did not involve any substantial constitutional question. (Doc. 8-1, Ex. 10).

### PETITIONER'S FIRST MOTION FOR NEW TRIAL

On July 20, 1999, Petitioner, through counsel, filed a motion for a new trial or in the alternative, a petition for post-conviction relief. (Doc. 8-1, Ex.13). Petitioner alleged "new evidence" showed the identification procedure used by the State in the pretrial stage was prejudicial to Petitioner because the photo array shown to Tamika Harris, the State's only eyewitness to the incident, was unduly suggestive and resulted in a substantial risk of misidentification. Petitioner

6

filed an addendum to his motion for a new trial on August 3, 1999, including a notarized statement of one of the State's witnesses, Lee Malone, verifying Petitioner was innocent of the murder charge. (Doc. 8-1, Ex. 14). The State filed a brief in opposition. (Doc. 8-1, Ex. 15). On October 22, 1999, the trial court denied Petitioner's motion for a new trial without explanation. (Doc. 8-1, Ex. 16). The court subsequently issued findings of fact and conclusions of law, determining Petitioner's petition for post-conviction relief was untimely and the claims were barred by res judicata. The court also found the "new evidence" claimed by Petitioner was either used at trial or known by defense counsel at the time of trial. (Doc. 8-1, Ex. 17). On October 26, 1999, the trial court denied Petitioner's motion for post-conviction relief. (Doc. 8-1, Ex. 18). On November 4, 1999, Petitioner filed a motion for amendment of findings of fact and conclusions of law on the grounds that the trial court failed to address the Prosecutor's improper handling of the nitrite (gunpowder) tests. (Doc. 8-1, Ex. 19). The State filed a brief in opposition. (Doc. 8-1, Ex. 20). On February 14, 2000, the trial court denied Petitioner's motion for amendment of findings of fact and conclusions of law. (Doc. 8-1, Ex. 21).

Petitioner filed a timely notice of appeal for Case No. CA99-77292. (Doc. 8-1, Ex. 22). In his brief, Wheat raised three assignments of error:

1.    The trial court erred in denying Defendant's motion for a new trial and/or in the alternative petition for post-conviction relief.

2.    The trial court erred in not granting the Defendant, no less than, an oral hearing as demanded for presentation of a full and complete record on the issues to the Court of Appeals.

3.    The trial court erred in the determination of findings of fact and conclusions of law and further denying the Defendant's motion for amendment of findings of fact and conclusions of law.

7

(Doc. 8-2, Ex. 23). The State filed a brief in response. (Doc. 8-2, Ex. 24). On November 6, 2000,

the Court of Appeals affirmed the judgment of the trial court. (Doc. 8-2, Ex. 25). On December 11,

2000, Petitioner filed a notice of appeal and a memorandum in support in the Ohio Supreme Court.

On March 7, 2001, the Ohio Supreme Court declined jurisdiction and dismissed the case. (Doc. 8-3,

Ex. 27).

## JOHNSON'S POST-CONVICTION PROCEEDINGS

In the meantime, co-defendant Johnson appealed his conviction and sentence and raised the

following three assignments of error:

> 1.    The trial court erred in admitting evidence regarding eyewitness identification where the photographic identification procedure was impermissibly suggestive and unreliable.
>
> 2.    The trial court erred in not declaring a mistrial where prosecutorial misconduct occurred as a result of prosecutor's statements during voir dire, opening statements and trial that Defendant was a member of a gang and no evidence was presented on this issue.
>
> 3.    The trial court erred in not declaring a mistrial where there was substantial evidence that improper third party communications with jurors resulted in jurors' concern about personal safety and intimidation, which prejudiced Defendant's right to be tried by a fair and impartial jury.

(Doc. 8-1, Ex. 11).

On January 27, 1997, the Court of Appeals affirmed the judgment of the trial court. (Doc.

8-1, Ex. 11). Johnson did not file a timely appeal to the Ohio Supreme Court and on May 14, 1997,

his motion for leave to file a delayed appeal was denied. (Doc. 8-1, Ex. 12).

On January 23, 2004, Johnson filed a motion for leave to file a motion for a new trial, and

a motion for a new trial in the Cuyahoga County Court of Common Pleas. Johnson claimed to have

8

newly discovered evidence that he was previously unavoidably prevented from obtaining. (Doc. 8-3, Ex. 28). On January 29, 2004, the court granted leave to file the motion for a new trial. On February 25, 2004, however, the court struck the motion for a new trial as Johnson failed to file his new evidence within seven days of the order. (Doc. 8-3, Ex. 29). On March 16, 2004, Johnson filed a motion for an evidentiary hearing based on newly discovered evidence and attached an affidavit from Tamika Harris recanting her previous testimony. In the affidavit, Ms. Harris stated she identified Johnson in a photo array because he was wearing a jacket similar to the one worn by the shooter as he ran past her on the date of the incident. (Doc. 8-3, Ex. 30). The court held a hearing to determine if Johnson had been unavoidably prevented from discovering the new evidence and ordered the parties to submit briefs. (Doc. 8-3, Ex. 32). On June 18, 2004, Johnson submitted a post hearing brief. (Doc. 8-3, Ex. 32). On July 22, 2004, the court found that Johnson was unavoidably prevented from timely filing his motion for a new trial. (Doc. 8-3, Ex. 33). On July 27, 2004, Johnson filed his motion for a new trial and attached excerpts from the transcript he deemed relevant. (Doc. 8-3, Ex. 34). The State filed a response to the motion for a new trial. (Doc. 8-3, Ex. 35). On September 17, 2004, the court granted Johnson a new trial. (Doc. 8-3, Ex. 36).

On October 18, 2004, the State of Ohio appealed from the entries granting Johnson a new trial for Case No. CA04085416. In its brief, the State presented the following assignments of error:

1. The Common Pleas Court erred in finding that defendant was unavoidably prevented from timely filing his motion for new trial. (Journal Entry dated July 22, 2004).

2. The trial court erred in granting Johnson's motion for new trial. (Journal Entry dated September 17, 2004).

(Doc. 8-3, Ex. 37). The State argued the "new evidence" had been presented to the jury at the trial,

9

referring to the relevant portions of the transcript. On May 6, 2005, Johnson filed a brief disputing the details of the testimony presented at trial and the significance thereof in context. (Doc. 8-3, Ex. 38). On August 4, 2005, the Court of Appeals issued a journal entry and opinion concluding the judgment of the trial court was not reasonable and the trial court abused its discretion by granting a new trial, thereby reversing the trial court's judgment. The Court of Appeals found  the contradictions in Harris's testimony had been presented and argued at trial. (Doc. 8-3, Ex. 39). Johnson filed a motion for reconsideration, which the court denied on August 4, 2005. (Doc. 8-3, Ex. 40).

Johnson timely appealed to the Ohio Supreme Court on September 19, 2005 and presented the following propositions of law:

1.      A trial court's determination that a criminal defendant's delay in filing a motion for new trial based upon newly discovered evidence, was reasonable under the circumstances and should not be disturbed on appeal absent a clear abuse of discretion on the part of the trial court.

2.      A trial court's conclusion that a criminal defendant has presented newly discovered evidence justifying a new trial is not unreasonable or arbitrary and should not be disturbed on appeal if supported by competent and credible evidence.

(Doc. 8-3, Ex. 42). The State did not respond. On January 25, 2006, the Ohio Supreme Court declined jurisdiction and dismissed the case. (Doc. 8-3, Ex 43). Johnson's motion for reconsideration was denied on March 29, 2006. (Doc. 8-3, Ex.44, 45).

## PETITIONER'S SECOND MOTION FOR NEW TRIAL

Meanwhile, on November 22, 2004, Petitioner and Glover filed a joint motion for leave to file motion for a new trial based on the same "newly discovered evidence" Johnson alleged in his motion for a new trial (Doc. 8-4, Ex. 46) – that Tamika Harris had recanted her testimony

identifying Johnson as the shooter. The State filed a response in opposition. (Doc. 8-4, Ex. 47). On

April 19, 2005, Petitioner's motion for leave to file a motion for a new trial was denied due to res

judicata. (Doc. 8-4, Ex. 48).

On May 17, 2005, Petitioner filed a timely notice of appeal under Case No. CA05-86409.

(Doc. 8-4, Ex. 49). In his brief, Petitioner set forth the following assignments of error:

1. The trial court erred in barring Defendant's request to file a delayed motion for a new trial based on res judicata. It was an improper application of this doctrine in that the facts alleged in this motion are separate and distinct from those posed in Defendant's previous motion for a new trial.

   a. Res judicata is only to be applied when an issue is substantially related to a previously adjudicated matter.

   b. Rule 33 of the Ohio Criminal Rules does not limit the number of motions for a new trial a Defendant may bring.

   c. The basis for this motion for a new trial is materially different from the previous motion sought by Defendant.

2. The trial court erred in denying Defendant's request to file a delayed motion for a new trial by reason of newly discovered evidence. The Defendant presented ample proof that the evidence was undiscoverable within the statutory 120 day period and, therefore, Defendant is entitled to a hearing on his motion for a new trial.

(Doc. 8-4, Ex. 50). The State filed a brief in response. (Doc. 8-4, Ex.51). On March 6, 2006, the

Court of Appeals affirmed the judgment of the trial court. (Doc. 8-4, Ex. 51). Petitioner did not

appeal this decision to the Ohio Supreme Court and ceased the appeals process on the advice of his

attorney; namely, that there was no legal reason to appeal because Johnson had been unsuccessful

in his post-conviction efforts for a new trial. (Doc. 17, at 6).

11

## JOHNSON'S FEDERAL HABEAS CORPUS PROCEEDINGS

On November 21, 2006, Johnson, through counsel, filed a federal habeas corpus petition and asserted the following grounds for relief:

> **Ground One**: The Eighth District Court of Appeals deprived petitioner of his due process rights by erroneously holding that the trial court abused its discretion in granting petitioner's motion for leave to file a motion for a new trial.

> **Ground Two**: The Eighth District Court of Appeals deprived petitioner of his due process rights by erroneously holding that the trial court abused its discretion in granting petitioner's motion for a new trial.

(Doc. 8-4, Ex. 53). The State filed a response arguing Johnson's claims were barred by the statute of limitations and procedurally defaulted. (Doc. 8-4, Ex. 54). Johnson filed a traverse on May 14, 2007. (Doc. 8-4, Ex. 55). On May 20, 2008, a Report and Recommendation was issued. (Doc. 8-4, Ex. 56); *Johnson v. Gansheimer*, 2008 U.S. Dist. LEXIS 123230 (N.D. Ohio 2008). The Magistrate Judge found Johnson's petition was time-barred, but he was entitled to equitable tolling based on "newly discovered evidence" – Tamika Harris's alleged recantation and new gunshot testing procedures – which created a credible claim of actual innocence. The evidence before the court was 1) Tamika Harris' communication with Johnson's mother that she recanted her identification of Johnson as the shooter; and 2) an electronic message Tamika Harris sent to Johnson through the Innocent Inmates website. (Doc. 8-4, Ex. 56); *Johnson v. Gansheimer*, 2008 U.S. Dist. LEXIS 123230, at *23 (N.D. Ohio 2008). The District Court then recommended Johnson's request for an evidentiary hearing be granted.  (Doc. 8-4, Ex. 56); *Johnson*, 2008 U.S. Dist. LEXIS 123230, at *31-35 (N.D. Ohio 2008). Over objections, the Report and Recommendation was adopted on July 11, 2008. (Doc. 8-4, Ex. 57).

Prior to the evidentiary hearing, the State filed a motion in limine to prohibit introduction

of Johnson's expert document or testimony at the hearing – specifically, a report on gunshot residue prepared by Johnson's expert, John W. Kilty, a forensic science consultant. The State argued the report should have first been presented to the state courts in a post-conviction action. (Doc. 8-4, Ex. 58). The State also filed a motion to clarify the scope of the evidentiary hearing to prohibit a freestanding claim of actual innocence. (Doc. 8-4, Ex. 59). On October 6, 2008, the District Court denied the State's motion in limine, but granted the motion to clarify. (Doc. 8-4, Ex. 62). On October 3, 2008, the State filed a motion for summary judgment. (Doc. 8-4, Ex. 63). Johnson filed a response, to which the State filed a reply. (Doc. 8-4, Ex. 64-65). The evidentiary hearing was held on October 22, 2008. Thereafter, Johnson filed a post-hearing brief and the State filed a brief in response. (Doc. 8-4, Ex. 66-67).

On August 3, 2009, the Magistrate Judge issued a report and recommendation recommending the State's motion for summary judgment be granted and Johnson's petition for a writ of habeas corpus be denied. (Doc. 8-4, Ex. 68). The report and recommendation was adopted on September 21, 2009. (Doc. 8-4, Ex.69). Johnson did not pursue an appeal of this decision.

### PETITIONER'S THIRD MOTION FOR A NEW TRIAL

On January 12, 2009, Petitioner, now represented by the Ohio Innocence Project from the University of Cincinnati College of Law, filed a third motion for leave to file a motion for a new trial. (Doc. 8-4, Ex.70) Petitioner alleged newly discovered evidence established his conviction was based on unreliable gunshot residue testing. On February 13, 2009, the State filed a consolidated brief in opposition to Petitioner's motion for leave and to an identical but separately-filed motion by Glover[1], as well as a separate motion filed by Johnson, raising similar issues. (Doc. 8-4, Ex. 71).

---

1. Glover was also represented by the Ohio Innocence Project.

The trial court granted the motion for leave on February 26, 2009. Petitioner filed his motion for new

trial on March 12, 2009. (Doc. 8-4, Ex. 73). On March 30, 2009, the State filed a consolidated brief

opposing the motion for a new trial (Doc. 8-4, Ex. 74), and a motion in limine to exclude evidence

and argument from prior motions for new trial. (Doc. 8-4, Ex. 75). Petitioner (and Glover) filed a

response in opposition to the motion in limine. (Doc. 8-4, Ex. 76). On April 16, 2009, the parties

filed a joint stipulation that the testimony and report of forensic expert John Kilty, from Johnson's

federal habeas corpus action, were to be included as part of the record in this case. (Doc. 8-4, Ex.

77). On April 16, 2009, the trial court held a joint hearing with all three defendants on the motion

for a new trial. Petitioner subsequently filed a post-hearing brief and the State filed a joint response

brief. (Doc. 8-4, Ex.78; Doc. 8-5, Ex. 79). On June 23, 2009, the trial court denied Petitioner's

motion for a new trial without findings or an opinion. (Doc. 8-5, Ex. 80).

Petitioner timely appealed the denial of his motion for a new trial to the Eighth District Court

of Appeals under Case No. CA09093671. (Doc. 8-5, Ex. 81). Johnson and Glover filed separate

appeals. In his brief, Petitioner raised the following assignment of error:

1.    The trial court abused its discretion in denying Wheat's motion for a new trial
based on newly discovered evidence pursuant to Ohio Criminal Rule 33(A)(6).

    A.    The jury would have reached a different verdict with the benefit of the
newly discovered evidence.

    B.    The new evidence could not have been discovered with reasonable
diligence before trial because it did not exist at the time of trial.

    C.    The new forensic evidence is material, is not merely cumulative of former
evidence and does not merely impeach or contradict former evidence.

    D.    Confidence in the outcome of the trial must be viewed relative to the
evidence as it exists today.

14

(Doc. 8-5, Ex. 82). The State filed a brief in response (Doc. 8-5, Ex. 83), to which Petitioner filed

a reply (Doc. 8-5, Ex. 84). On September 2, 2010, the Eighth District Court of Appeal affirmed the

judgment of the trial court in Petitioner's case (Doc. 8-5, Ex. 85), as well as in the appellate cases

of Glover and Johnson.

Petitioner, through counsel, filed a timely notice of appeal to the Ohio Supreme Court. (Doc.

8-5, Ex. 86) (Case No. 10-1787). In his memorandum in support of jurisdiction, Petitioner asserted

the following propositions of law:

> I.  A significant, undisputed sea change in scientific testing and analysis can constitute newly discovered evidence for purposes of a motion for new trial pursuant to Rule 33(A)(6) of the Ohio Rules of Criminal Procedure.
>
> II.  Where newly discovered evidence demonstrates that scientific evidence used at the underlying trial is unreliable and no longer admissible, the trial court shall order a new trial if the absence of the now-unreliable scientific evidence would have resulted in a different outcome.

(Doc. 8-5, Ex. 87). The State filed a memorandum in response. (Doc. 8-5, Ex. 88). On February 2,

2011, the Ohio Supreme Court declined jurisdiction. (Doc. 8-5, Ex. 89).

## FEDERAL HABEAS CORPUS

Petitioner, through counsel, filed the instant federal habeas petition on February 2, 2012 and

raised the following grounds for relief:

> **Ground One**: Derrick Wheat is actually innocent of Clifton Hudson's murder. His conviction violates the U.S. Constitution.
>
> **Ground Two**: The new evidence presented is so compelling that it would be a violation of fundamental fairness embodied in the Due Process Clause of the U.S. Constitution not to afford Derrick Wheat a new trial where new evidence would be considered.
>
> **Ground Three**: Derrick Wheat's conviction was based on a pretrial identification

procedure that was so "impermissibly suggestive as to give rise to the likelihood of irreparable misidentification" in violation of Wheat's Due Process rights in violation of the U.S. Constitution. The pretrial identification procedure rendered the in court identification unusable-the subsequent use of the in court identification was in violation of Wheat's due process rights in violation of the U.S. Constitution.

**Ground Four**: Derrick Wheat's Due Process Rights embodied in the U.S. Constitution were violated when the State failed to disclose to Petitioner's trial counsel that (1) they informed Ms. Harris prior to her viewing of the three photos that they had the suspects in custody and asked her which one was the shooter, (2) the police officer administering the line-up pointed at Eugene Johnson, and (3) police "confirmed" to Ms. Harris that the identification was "correct" by informing her that "the other two" had "gunpowder" on them.

**Ground Five**: Derrick Wheat's conviction was based on a pretrial identification procedure that was so "impermissibly suggestive as to give rise to the likelihood of irreparable misidentification" in violation of Wheat's due process rights. The evidence not disclosed, listed in Petitioner's Fourth Ground for Relief, rendered the pretrial identification so impermissibly suggestive that it is clear that a misidentification took place in violation of Wheat's Due Process Rights in the U.S. Constitution, U.S. Const. Amend. V and XIV.

**Ground Six**: Derrick Wheat's Due Process rights under Brady v. Maryland were violated when the three pieces of evidence listed out in Petitioner's Third Ground for Relief were not disclosed to trial counsel as they were impeachment material of the State's sole eyewitness.

**Ground Seven**: The Eighth District Court of Appeals overturned the trial court's granting of a new trial for Eugene Johnson, which was granted, in part, based on Tamika Harris's testimony regarding the suggestiveness of the line-up procedure. The Eighth District Court of Appeals, in its reversal, failed to consider Tamika Harris's post-conviction testimony, and simply relied on the original opinion in the direct appeal of Eugene Johnson. *State v. Johnson*, 1997 Ohio App. LEXIS 100 (Ohio Ct. App., Cuyahoga County Jan. 16, 1997). The trial court denied Petitioner's Motion for New Trial based on the Eighth District Court of Appeals reversal of the trial court in *State v. Johnson*, 2005 Ohio 3724 (Ohio Ct. App., Cuyahoga County July 21, 2005). Petitioner was denied Due Process when the Eighth District Court of Appeals failed to consider the three pieces of evidence, not disclosed to Petitioner's trial counsel, listed in Petitioner's Third Ground for Relief and wholly failed to reevaluate the line-up procedures in light of this evidence.

**Ground Eight**: Derrick Wheat's trial counsel rendered unconstitutionally deficient

representation during pre-trial and trial phases of Petitioner's trial when they (1) failed to request a suppression hearing to suppress an unconstitutional line-up procedure, and (2) failed to object to a private meeting with a juror and failed to conduct voir dire of the juror when that juror raised safety concerns when either Glover, Johnson, or Wheat (the Juror couldn't tell which one it was) said "hi" to the juror in the cafeteria at lunchtime.

**Ground Nine**: The State committed prosecutorial misconduct during voir dire, and opening and closing arguments, when the State discussed "gang activity" of the defendants but failed to present any evidence, and engaged in unconstitutional burden shifting when the State commented on the Petitioner's failure to call an expert on gunshot residue.

**Ground Ten**: Wheat was deprived of a fair trial and due process rights when a juror who feared for their personal safety when an unidentifiable defendant said hi in the cafeteria, was permitted to deliberate on Petitioner's jury.

**Ground Eleven**: The cumulative constitutional error in Grounds for Relief 1-10 deprived Wheat of a fair trial in violation of due process.

(Doc. 2).

## JURISDICTIONAL ISSUES

In determining whether to issue a habeas writ, the standards set forth in the Antiterrorism and Effective Death Penalty Act (AEDPA) govern the district court's review of a state court decision. *French v. Jones*, 332 430, 435-36 (6th Cir. 2003), *cert. denied*, 540 U.S. 1018 (2003); 28 U.S.C. § 2254. Before a reviewing court may decide a habeas writ on the merits, a petitioner must overcome the one-year statute of limitations promulgated by AEDPA. *Allen v. Yukins*, 366 F.3d 396, 399 (6th Cir. 2004), *cert. denied*, 543 U.S. 865 (2004). Under the doctrine of equitable tolling, this Court has the authority to excuse late filed habeas claims in limited circumstances. *McSwain v. Davis*, 287 Fed. Appx. 450, 456 (6th Cir. 2008) (quoting *Solomon v. United States*, 467 F. 3d 928, 933 (6th Cir. 2006) (The Sixth Circuit "repeatedly caution[s] that equitable tolling should be granted 'sparingly'"). While the initial burden of raising the statute of limitations defense is on the state, the

17

burden of proof is on the habeas petitioner to persuade the court he or she is entitled to equitable tolling. *McSwain*, 287 Fed. Appx. at 456.

One form of equitable tolling recognized by the Sixth Circuit is the claim of "actual innocence". *Souter v. Jones*, 395 F.3d 577, 588-89 (6th Cir. 2005). In determining whether a petitioner has met the requirements for establishing a cognizable claim of actual innocence for purposes of equitable tolling, the Sixth Circuit applies the actual innocence standard developed in *Schlup v. Delo*, 513 U.S. 298 (1995). *Souter*, 395 F.3d at 588-89. The standard requires the district court to make a probablistic determination about what reasonable, properly instructed jurors would do. Thus, a petitioner does not meet the standard unless he persuades the district court that in light of the new evidence, no juror, acting reasonably, would have voted to find him guilty beyond a reasonable doubt. *Mc.Cray v. Vasbinder*, 499 F.3d 568, 571-72 (6th Cir. 2007) (quotations omitted); *see also Souter,* 395 F.3d at 602.

> This standard does not require absolute certainty about the petitioner's guilt or innocence: A petitioner's burden at the gateway stage is to demonstrate that more likely than not, in light of the new evidence, no reasonable juror would find him guilty, beyond a reasonable doubt – or, to remove the double negative, that more likely than not any juror would have reasonable doubt.

*McSwain*, 287 Fed. Appx at 458-59.

"The *Schlup* standard is demanding and permits review only in the 'extraordinary' case." *House v. Bell*, 547 U.S. 518, 538 (2006) (quoting *Schlup*, 513 U.S. at 327). The petitioner must present *new evidence* of innocence that is so strong a reviewing court cannot have confidence in the outcome of the trial. *Schlup*, 513 U.S. at 327. New evidence may be "exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence – that was not presented at trial." *Id*. at 324. Actual innocence does not mean actual innocence in the practical sense of the

18

term; rather, actual innocence, if proven, is a "gateway" that allows courts to reach the merits of other claims that would otherwise be time-barred or defaulted. *Schlup*, 513 U.S. at 316.

DISCUSSION

The parties do not dispute Petitioner's claim is time-barred; rather, the parties dispute whether Petitioner can surmount the actual innocence threshold. At the outset, Petitioner argues he is entitled to an actual innocence finding because another district court found Johnson met the actual innocence standard. Regardless, Petitioner argues he has a credible claim of actual innocence based the following "new evidence": 1) Tamika Harris's recantation; and 2) new gunshot testing procedures that invalidate the old gunshot testing procedure. For the following reasons, Petitioner's assertions are not well-taken.

**Johnson's Actual Innocence**

As noted above, a district court found co-defendant Johnson met the actual innocence standard, but later denied Johnson's writ for habeas corpus on the merits. *See Johnson v. Gansheimer*, 2008 U.S. Dist. LEXIS 123230 (N.D. Ohio 2008); *Johnson v. Gansheimer*, 2009 U.S. Dist. LEXIS 87690 (N.D. Ohio 2009). Petitioner demands a finding of actual innocence because he and Johnson's convictions are "inextricably linked" and finding otherwise would be "preposterous". (Doc. 11, at 1). The undersigned disagrees. While the parties in this case are certainly linked, each played different roles, with different pieces of evidence linking them to the crime. For instance, Tamika Harris's "recantation" centers on her identification of Johnson. All testimony and evidence relating to Petitioner remains the same.

In addition, this Court has testimony and evidence that was not before the federal court when it made its decision concerning Johnson's actual innocence. Namely, Tamika Harris and John Kilty's

testimony at Jonnson's federal evidentiary hearing and new post-conviction hearing decisions. Importantly, *res judicata* does not apply here and there is no "actual innocence by proxy" rule governing co-defendants. Therefore, this Court is not bound by another court's finding regarding Johnson's actual innocence as applied to Petitioner.

***Tamika Harris's Recantation***

On January 12, 1996, Ms. Harris testified at the trial for Mr. Hudson's murder, after which Petitioner, Johnson, and Glover were convicted. (Doc. 8-7, Tr. 237-362). Ms. Harris testified she saw a man come from behind a black 4 x 4. (Doc. 8-7, Tr. 274-75). Ms. Harris said she "sort of saw a gun" and saw a "boy shooting another boy" – the same man who came from behind the black 4 x 4. (Doc. 8-7, Tr. 237-362). After the shooting, the black 4 x 4 drove towards her. (Doc. 8-7, Tr. 248-51). At the same time, the shooter ran towards her following the black 4 x4. (Doc. 8-7, Tr. 248-51). The black 4 x 4 slowed down, the shooter went behind the vehicle, and was not seen after the vehicle  drove away. (Doc. 8-7, Tr. 248-51). Ms. Harris did not actually see the shooter get in the vehicle. (Doc. 8-7, Tr. 248-51). When asked if she saw the shooter's face, Ms. Harris said, "enough to identify him." (Doc. 8-7, Tr. 256). She then testified the shooter was wearing a black hoodie under a maroon, blue, and green Nautica coat – the same clothing Johnson was photographed in after his arrest. (Doc. 8-7, Tr. 256-57, 263-66). Ms. Harris subsequently identified Johnson in the same photograph. (Doc. 8-7, Tr. 256-57, 263-66).

Ms. Harris was cross-examined at length about her identification of Johnson. (Doc. 8-7, Tr. 268-). On cross, Ms. Harris testified she did not see the shooter's face that well. (Doc. 8-7, Tr. 280). She also admitted she made a statement to police that she saw the shooter get in the black 4 x 4, even though she testified she did not see him get into the car. (Doc. 8-7, Tr. 282-83).

20

On October 22, 2008, Ms. Harris testified at an evidentiary hearing for Johnson's federal habeas case. (Doc. 8-13, Tr. 81-100). Her testimony at this hearing best summarizes the events surrounding her "recanting" after the murder trial.

In 1998, Mr. Avery, an advocate on behalf of the Johnson family, contacted Ms. Harris and asked if she would give another statement about what she saw the night of the murder. (Doc. 8-13, Tr. 95-96). Mr. Avery asked Ms. Harris if he could bring Johnson's mother. Ms. Johnson attended the interview and met Ms. Harris. (Doc. 8-13, Tr. 96). Ms. Harris told Mr. Avery her testimony had not changed since trial. (Doc. 8-13, Tr. 96).

In 2000, Ms. Harris expressed misgivings about her trial testimony to her mother – specifically, her identification being based on Johnson's clothing. (Doc. 8-13, Tr. 87-88). Ms. Harris testified she was reading Cleveland Scene Magazine in late 2000 and came across an article about a website called Innocent Inmates. (Doc. 8-13, Tr. 87). Ms. Harris went on the website, "not thinking of the case exactly" when Petitioner, Johnson, and Glover's pictures came up describing their convictions in Mr. Hudson's murder. (Doc. 8-13, Tr. 83). At this time, Ms. Harris testified she emailed the website, thinking she was contacting Johnson directly, stating she "may have been wrong in the statement [she] made and when [she] testified at trial." (Doc. 8-13, Tr. 87-88).

When asked why she was not in a position anymore to say the shooter was Johnson, Ms. Harris stated, "Because when I made the identification, it was based solely off of the fact that there was only three people [in the photo lineup] [], and [] one person had on exactly what I described to the police officers [at] the scene as to what [I said] the suspect had on." (Doc. 8-13, Tr. 91).

Ms. Harris testified that in 2003 she met with and provided an affidavit regarding her trial testimony and identification of Johnson to Rod Kee, operator of Innocent Inmates. (Doc. 8-13, Tr.

21

93). Ms. Harris testified she provided a similar affidavit in 2004 (Doc. 8-13, Tr. 93).

Relating back to the night of murder, Ms. Harris stated she heard two gunshots and a pause (Doc. 8-13, Tr. 83).  A man came from behind a Bronco, the Bronco continued to drive by the man, then Ms. Harris saw this man fatally shoot Mr. Hudson (Doc. 8-13, Tr. 83). The shooter then went back toward the Bronco. (Doc. 8-13, Tr. 84). Ms. Harris went to the police station, was shown photographs of three individuals, and identified Johnson as the shooter based on his clothing – a black hoodie and maroon and green down coat, either Nautica or Tommy Hilfiger. (Doc. 8-13, Tr. 85).  Concerning her identification of Johnson as the shooter, Ms. Harris was not sure if  she said to police at the time "yes, this is him", but she was sure she said her identification was based on his clothing. (Doc. 8-13, Tr. 85).

Recanting witnesses are viewed with extreme suspicion.  *McCray v. Vasbinder*, 499 F.3d 568, 574 (6th Cir. 2007). Recantation "upsets society's interest in finality of convictions, is very often unreliable and given for suspect motives, and most often serves merely to impeach cumulative evidence rather than to undermine confidence in the accuracy of the conviction." *Carter v. Mitchell*, 443 F.3d 517, 539 (6th Cir. 2006) (citing *Dobbert v. Wainwright*, 468 U.S. 1231, 1233-34 (1984)).

Ms. Harris's recantation centers on doubts concerning her facial identification of Johnson; however, she was cross-examined and impeached regarding her facial identification of Johnson. Further, while Ms. Harris's assessment of her identification has changed, the underlying rationale of her testimony has remained the same – that she never got a clear look at Johnson's face on the night of the shooting, and her identification was based on Johnson's clothing. At best, Ms. Harris's "recantation" shows her doubt as to whether she saw Johnson's face, which she was questioned about on cross-examination.

22

The undersigned must view recanting statements with extreme suspicion. Indeed, the time line leading to Ms. Harris's "recanting" gives reason to pause. In 1998, Johnson's defense team asked to speak with Ms. Harris in the presence of Johnson's mother, a presumably uncomfortable situation for anyone, let alone an adolescent. After this meeting, Ms. Harris expressed misgivings to her own mother about identifying Johnson.  In 2000, Ms. Harris came across a website, notably titled "Innocent Inmates", discussing the case she testified in, which proclaimed Petitioner, Johnson, and Glover were innocent. After reading the Innocent Inmate story, Ms. Harris publicly called her facial identification of Johnson into question and reached out to Johnson about her testimony. The time line indicates Ms. Harris remained steadfast in her testimony until she was called into question by Johnson's defense team in the presence of his mother, and a website proclaiming she got it wrong.

Importantly, Ms. Harris's only doubt concerning her testimony was her facial identification of Johnson. Her testimony relating to Petitioner's role remains the same. Namely, that Ms. Harris identified a black 4 x 4 vehicle; Petitioner was the passenger in the black 4 x 4; the vehicle was at the scene of the shooting; Ms. Harris heard two gunshots followed by a pause; the shooter came from behind the vehicle and fatally shot Mr. Hudson; the vehicle drove past Ms. Harris; Ms Harris saw two people in the vehicle; the shooter followed the vehicle; then the shooter disappeared behind the vehicle after it slowed down next to him. No one has disputed this portion of the testimony ostensibly linking Petitioner to the crime.

Therefore, regardless of whether the Ms. Harris's testimony is considered new – and the undersigned does not believe it is – Petitioner fails to persuade the Court, based on Ms. Harris's "recantation", a reasonable juror would have had reasonable doubt as to Petitioner's guilt and thus

23

found him not guilty.

### *Gunshot Testing*

Petitioner also argues the gunshot residue test performed on him and his co-defendants was unreliable. Petitioner's basis for this argument is that a more accurate test has been developed and accepted by government agencies to detect gunshot residue since Petitioner's trial. The parties briefed the Court substantially about gunshot residue testing and particle fusion, and provided evidence regarding contamination probability. However, one simple fact remains: Petitioner attacks the validity of the test itself, not its application, and while the original testing may be outdated, it was not unreliable.

At trial, Dr. Rosenberg, a forensic scientist with Cuyahoga County's Coroner's Office testified as an expert witness concerning the gunshot residue ("GSR"). (Doc. 8-7). Dr. Rosenberg obtained samples collected from the hands and clothes of Petitioner and his co-defendants. The test she used, known as Atomic Absorption Spectrometry ("AAS"), could trace particles consistent with GSR for someone who fired a gun, or was nearby a gun being discharged in close proximity. (Doc. 8-7).  Dr. Rosenberg not only looked for GSR particles, but high quantities of GSR particles in one area. (Doc. 8-7). She testified there was no indication the samples taken were contaminated, and determined Petitioner's hands and the gloves found in Johnson's jacket showed evidence of GSR. (Doc. 8-7). On cross, Dr. Rosenberg acknowledged other materials contain the same particles as GSR, but reiterated the particle quantity was high enough to be consistent with GSR. (Doc. 8-7).

Mr. Turbok, a forensic firearm examiner, testified the passenger side of Glover's vehicle contained lead residue consistent with particles in GSR. (Doc. 8-7). Petitioner was seated in Glover's passenger seat at the time of the murder.

Petitioner argues, at length, that an FBI Symposium Report supports the contention that Petitioner tested positive for gunshot residue because the AAS test did not account for the possibility that he was exposed GSR in a police vehicle or at the police station. Further, Petitioner argues John Kilty's testimony at Johnson's federal evidentiary hearing reveals possible contamination was not accounted for during initial AAS testing. Mr. Kilty criticized Dr. Rosenberg's testing because the AAS test did not account for possible contamination from the time of the shooting, to the time of arrest, to the time the sample was taken.

In 2009, after Johnson's habeas petition was denied, Petitioner, Johnson, and Glover filed a motion for new trial in which they presented the same GSR testing flaws asserted in the instant Petition. The court denied the motion and surmised the following:

> All the parties admit that once the AAS testing method is conducted on a sample, that sample is destroyed and cannot be retested for the presence of GSR. As such, Johnson has no newly discovered evidence upon which to request a new trial; he merely has a newly discovered theory upon which he wishes to impeach a prior witness. . . . Science is an ever evolving field, and criminal defendants should not be afforded a new trial every time the scientific testing methods for forensic evidence change.

*State v. Johnson*, 2010 Ohio 4117, No. 93635, 2010 WL 3442282, ¶25 (Ohio Ct. App. 2010).

At best, Petitioner only shows new gunshot residue testing has improved or is more accurate. As respondent points out, the greater accuracy of current standards does not logically imply that the older standards are unreliable. (Doc. 8-14, Tr. 97-116; Doc. 8-13, Tr. 6-55). Further, Petitioner's experts agreed the particles found on Petitioner's hand based on the old test were consistent with GSR. (Doc. 8-14, Tr. 97-116; Doc. 8-13, Tr. 6-55). At Petitioner's hearing on his motion for new trial in 2010, Mr. Nordby agreed that new testing was more precise, but that did not mean AAS was an improper form of testing. (Doc. 8-14, Tr. 75). Mr. Nordby said he had no confidence in Dr.

Rosenberg's AAS test, but admitted the chemical test was consistent with gunshot residue and this sort of testing was an accepted scientific test when Dr. Rosenberg performed it. (Doc. 8-14, Tr. 84).

Actual innocence must be based on "new reliable evidence  – whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence." *Schlup v. Delo*, 513 U.S. 298, 324 (1995). However, Petitioner does not have new scientific evidence; indeed, he has no evidence.  Petitioner has a theory, but his theory cannot overcome his own expert testimony that particles found on Petitioner and Johnson were consistent with GSR based on a scientifically accepted testing procedure when performed. At most, Petitioner's theory evidences impeachment value, which is not enough to present a valid claim of actual innocence. *See Plaza v. Hudson*, 2008 U.S. Dist. LEXIS 102083, at *39 (N.D. Ohio 2008) (impeachment evidence is not sufficient to establish a gateway claim of innocence).

### CONCLUSION AND RECOMMENDATION

Following review, the undersigned recommends the Court find Petitioner is not "actually innocent" according to the standard set forth in *Schlup* and *Souter*. Therefore, Respondent's Motion to Dismiss should be granted and the Petition (Doc. 2) denied and dismissed as time-barred. In accordance with the foregoing recommendation, Petitioner's  remaining motions (Docs. 12, 13, 17, 18, 20) are moot and should be denied.

>    s/James R. Knepp II
> United States Magistrate Judge

ANY OBJECTIONS to this Report and Recommendation must be filed with the Clerk of Court within fourteen days of service of this notice.  Failure to file objections within the specified time WAIVES the right to appeal the Magistrate Judge's recommendation. *See U.S. v. Walters*, 638 F.2d 947 (6th Cir. 1981); *Thomas v. Arn*, 474 U.S. 140 (1985).